OPINION OF THE COURT
Sidney Gribetz, J.
Fifteen-year-old Emily R. has been left adrift without a firm legal connection to a father. The man who executed an acknowledgment of paternity, and accordingly is legally recognized as her father, has barely been involved in her life and not seen her at all since she was seven years old. He is admittedly not her biological father. At the same time a man who wishes to be recognized as her father and take parental responsibility has been impeded from doing so by the uncertainties of the statutory scheme for vacating an acknowledgment of paternity.
The vagaries of Family Court Act § 516-a have set a tortuous path in the endeavor to establish proper paternity during the course of litigation spanning seven years. In response to this backlog, the Attorney for the Child has taken the unorthodox step of affirmatively filing this petition herself, naming both men as respondents. This petition seeks this court’s authority to vacate the acknowledgment of paternity and enter an order of filiation on the child’s own motion, notwithstanding that the statute authorizes only a signatory to the acknowledgment to challenge the acknowledgment in court.
In furtherance of the purposes of the acknowledgment of paternity system — to give stability to children and ease the procedures for child support — I grant the child’s application.
Background
Although there has been minimal testimony in the case before me regarding the prior history, the following can be gleaned from the records of prior cases, and the uncontroverted presentation of counsel.
*327 Emily’s mother, Ms. B., who was never married, was a teenager in 1997 when she began a romantic relationship with Juan Alexis C. Mr. C. was an adult in his thirties, and he was married to another woman at the time. The intimate relationship between Ms. B. and Mr. C. continued through 2005.
Meanwhile, during 2000 and 2001, the mother was simultaneously involved in an intimate relationship with Emilio R.
In approximately July 2000, Ms. B. became pregnant, and Emily was born in April 2001. The day after Emily’s birth, Ms. B. and Mr. R. executed an acknowledgment of paternity, which was promptly filed with the New York City Department of Health. Emily was given Mr. R.’s surname.
However, Ms. B. and Mr. R. ended their relationship shortly thereafter. Mr. R. saw Emily only approximately 10 times during her infancy, and last spent any significant time with her prior to her first birthday. Ms. B. successfully filed a petition in court to obtain an award of child support for Emily from Mr. R.
Meanwhile, during the first four years of Emily’s life, Mr. C. had frequent contact with Emily and developed a father-child relationship with her. While Emily and her mother moved to Florida in 2005, Mr. C. remained in contact with her by telephone and voluntarily sent funds for her support. In 2008, the mother and child returned to New York City, and Mr. C. visited Emily regularly.
It was during this period that the saga of attempts to straighten out the legal status of paternity began. First of all, during this period the mother and Mr. R. arranged for a private DNA test which reportedly demonstrated that Mr. R. was not . the child’s biological father. Significantly, their meeting at the testing site was the last time that Mr. R. ever saw Emily.
Then, in May 2009 the mother filed two petitions in this court, one to terminate the order of child support from Mr. R., and the other to vacate the acknowledgment of paternity that they had signed. These cases were dismissed for some reason, not clear in the records that exist. Thereafter, in August 2009, Mr. R. himself filed a petition to vacate the acknowledgment of paternity. In this petition, he made the verified statement that he was not the father of the child. However, Mr. R. failed to serve the mother with the papers, and thereafter he did not even appear in court, leading to the dismissal of the petition.
Meanwhile, the mother and Emily moved back to Florida. Reportedly, Mr. C. remained in contact with Emily by telephone *328 and sent gifts. Mr. R. no longer had any contact with Emily or the mother.
In May 2014, the mother and Emily returned to New York and stayed here for several months. During this time, Mr. C. visited Emily regularly.
The Latest Family Court Involvement
Once back in New York, further litigation ensued. In September 2014, the mother filed a petition for upward modification of Mr. R.’s original child support obligation. In response, in October 2014 Mr. R. filed a petition to vacate the acknowledgment of paternity. As the grounds for his application, Mr. R. claimed that there was a material mistake of fact, as he was not the child’s biological father. As an exhibit to the petition, he annexed a copy of the 2009 DNA test results, show-' ing a 0% probability that he was Emily’s father. This court’s clerical staff accredited Mr. R.’s application as a “Supplemental Petition” on the same docket as the mother’s child support modification petition. These cases were assigned in the normal course to a Support Magistrate. Recognizing that legal issues regarding the rights of the child might be implicated, the Support Magistrate assigned an attorney, from The Children’s Law Center, to represent Emily. During the course of these proceedings, the mother and Emily moved back to Florida. The mother withdrew her petition for modification of Mr. R.’s child support.
Without ruling yet on Mr. R.’s application to vacate the acknowledgment of paternity, the Support Magistrate on January 30, 2015 directed the mother, Emily, and Mr. R. to submit to formal DNA testing. The mother and Emily complied with that order, but Mr. R. never appeared for the court-ordered DNA test.
Given these delays in the legal proceedings, on February 13, 2015 the child’s attorney filed a petition for paternity to further the interests of her client Emily to have Mr. C. declared her legal father. The petition asserted numerous factual allegations of Emily’s ongoing relationship with Mr. C. and cited the legal principle of equitable estoppel. This petition was assigned to the Support Magistrate.
On the next court date before the Support Magistrate (Apr.. 22, 2015), Mr. R. did not appear, so the Magistrate dismissed his petition to vacate the acknowledgment of paternity for failure to prosecute. The child’s paternity docket was on the court’s calendar as well on that date, and present in court were *329 Ms. Burkavage (The Children’s Law Center Attorney for the Child) and Mr. C. The mother, Ms. B., participated by telephone from Florida.
Magistrate Bahr went on to state on the record, apparently in colloquy in dicta, that he could not proceed on the child’s petition because paternity was already established by means of the acknowledgment, and that no petition to vacate the acknowledgment was pending. He also stated that “paternity must be disestablished” and only then could he proceed on the child’s action. The Magistrate went on to question the authority of either the child or Mr. C. to challenge the validity of the acknowledgment of paternity, as they were not signatories thereto. Furthermore, he opined that “absent a possible biological basis” that Mr. C. was Emily’s father, he would not consider a claim for equitable estoppel. Having said these things, the Magistrate kept the child’s case open, and on his calendar, and directed the child to formally serve the papers on Mr. R.
The next court date before Magistrate Bahr was June 11, 2015. For that appearance, the Attorney for the Child prepared and submitted a thorough memorandum of law addressing the potential legal issues implicated. In court, once again the child’s attorney Ms. Burkavage appeared, Mr. C. was present, and the mother participated by telephone from Florida. Ms. Burkavage submitted an affidavit of service of her papers on Mr. R., who defaulted. There was also formal admission of service and receipt of the papers by both Mr. C. and by the mother, so issue was deemed joined. At this point, the Magistrate seemed to proceed with the case, notwithstanding his comments from the earlier appearance. He took statements from the mother on the record. Ms. B. said that she engaged in sexual intercourse with both Mr. C. and Mr. R. during the relevant time frame of Emily’s conception. The mother also reflected that she viewed her decision to execute the acknowledgment of paternity with Mr. R. while knowing that Mr. C. could have been the biological father as “a mistake you make in life.” The Magistrate went on to note the personal relationship that Mr. C. had developed with the subject child.
The Magistrate apparently did not make any formal ruling, but in his Uniform Case Management System notes wrote as follows:
“The big problem is that neither the mother nor Mr. R. . . . are petitioning to vacate the Acknowledgment of Paternity [‘AOP’]. While the child is *330 entitled to a paternity hearing, the statute does not permit the court to sua sponte vacate the AOP and substitute Mr. C. as the AOP dad. ... I held a paternity hearing and determined that there is a possibility that Mr. C. is the biological father. Other than that my hands are tied. I have no idea how to take Mr. R.’s name off the birth certificate if there is no petition to vacate the AOP. I did ask the Family Court Advisory and Rules Committee in November 2014 to make such a provision in the law, but nothing has happened yet.”
Next, the Magistrate, noting that a legal issue of equitable estoppel was implicated, decided to transfer the case to a Family Court Judge for judicial attention to that legal issue. In that context, the matter was then referred to me.
Proceedings before the Family Court Judge
Once the case was before me, I assigned 18-b counsel to both Mr. C. and the mother to ensure that they would have representation, given the significant and sophisticated legal issues at stake. I also conducted several conferences with counsel in an attempt to further refine the issues. These court dates for conferencing also served to afford further opportunities for Mr. R. to appear. However, he did not, and his continued default was noted. Finally, I set the matter down for a hearing date to give the parties a chance to develop the factual record and to submit further briefs, and to have an evidentiary hearing on any potential estoppel issues, if indicated.
On the hearing date the mother traveled from Florida to appear in person, and Mr. C. also appeared. Mr. R. did not. Mr. C.’s counsel stated as follows:
“I have discussed the case with my client and his options. He understands he has a right to have a hearing as to the estoppel issues, but he is ready today to admit that he is the father of the subject child ... so that the court at some future time would be able to enter an order of filiation naming him the father. However there is the issue of the Acknowledgment of Paternity' on Mr. R.”
In colloquy, Mr. C. said he wished to be named the father, but not until “the other guy was taken care of [sic].” Counsel for the mother and the Attorney for the Child stated that they were in agreement with this position. Accordingly, I allocuted the mother who admitted that she had sexual relations with *331 Mr. C. during the period of conception and believed him to be the father.
More significantly, I conducted an allocution with Mr. C. wherein I advised him of his legal rights to a hearing and DNA test, and the obligations and responsibilities he would be assuming. Waiving a formal hearing and/or a DNA test, he freely .admitted on the record that he had sexual relations with the mother during the relevant time frame. The proceedings continued:
“THE COURT: I am asking you directly and specifically do you believe that you’re Emily’s father biologically?
“Mr. C.: Yes.
“THE COURT: And have you held yourself out to be that father?
“Mr. C.: If I been there for her?
“THE COURT: Yes.
“Mr. C.: Yes.
“THE COURT: And have you been there for Emily in the past?
“Mr. C.: Yes.”
Ms. Burkavage chose not to present any testimony from her client or any further evidence. She offered to submit a further presentation in a supplemental memorandum of law, which she has done. The other two attorneys have not submitted any papers in response.
Discussion
The Child Support Enforcement Act of 1985 was a comprehensive effort designed to improve child support enforcement. While most of its provisions concerned collection efforts and procedures for tax and revenue, the bill also contained aspects related to court procedure. Among its stated goals was speeding the judicial resolution of child support cases. (See e.g. Assembly Mem in Support, Bill Jacket, L 1985, ch 809.)
The acknowledgment of paternity procedure was one part of this reform measure. Set forth in Social Services Law § 111-k and Public Health Law § 4135-b, the legislation authorized a process for the execution and filing of a form by the parents of a child born to an unwed mother. The acknowledgment of paternity “shall establish the paternity of a child and shall have the same force and effect as an order of paternity or filia *332 tion issued by a court of competent jurisdiction.” (E.g. Public Health Law § 4135-b [3] [a]; Family Ct Act § 516-a [a].) The statute provides for a 60-day window for challenge or rescission. However, after 60 days, an acknowledgment of paternity may be vacated only upon a formal petition, filed by a signatory of the acknowledgment, alleging and proving fraud, duress or material mistake of fact. (Family Ct Act § 516-a [b] [iv].)
The establishment of the acknowledgment of paternity statutory system in the first instance instituted some direction of regularity of a previously haphazard schema of informal acknowledgments and issuance of birth certificates for children of unwed mothers. However, an unintended result was the development of many nuances and uncertainties in litigation; even as to the protocols and procedures to be used in Family Court in considering a petition for vacatur. (See e.g. Wilson v Lumb, 181 Misc 2d 1033 [1999].)
In the leading case of Matter of Westchester County Dept. of Social Servs. v Robert W.R. (25 AD3d 62 [2005]), the Appellate Division, Second Department in an opinion by Justice Barry Cozier set forth guidelines for such cases, holding that the burden of proof was on the signatory party challenging the acknowledgment, and that even after a court would find that fraud, duress or material mistake of fact was established, the Family Court must then consider the “best interests of the child” before ordering DNA or GMT testing.
Other cases that arose highlighted additional ambiguities in the application of the statute. For example, in an unpublished decision in an otherwise publicized case, Family Court Judge W. Dennis Duggan in Albany County heard a matter where the father was convicted of murdering the mother, and the maternal grandmother seeking guardianship of their child petitioned to vacate the acknowledgment of paternity that the parents had signed. Judge Duggan noted the “absurd result” that would deny standing to the child’s guardian “when the father killed the only other person who could mount a challenge.”
In response to these cases, and others, in 2007 the legislature amended the statute to correct certain flaws, by codifying the procedure for the child’s best interests consideration envisioned by the Second Department’s decision (25 AD3d 62 [2005]), and adding a provision allowing other authorized parties to move to vacate an acknowledgment where a “signator dies or becomes mentally ill or cannot be found within the state.” *333 (L 2007, eh 462, § 1; see also Senate Introducer Mem in Support, Bill Jacket, L 2007, ch 462; Assembly Mem in Support of 2007 NY Assembly Bill A8629.)
But there are numerous other situations that have arisen over the years during litigation where the statutory requirement that only a signatory may challenge an acknowledgment has been an impediment to a non-signatory seeking to establish paternity. In response, there has been a developing case law that has authorized the awarding of paternity to a non-signatory notwithstanding the existence of an acknowledgment of paternity by a different man. In Matter of Dwayne J.B. v Santos H. (89 AD3d 838 [2011]), the Appellate Division, Second Department held that an “acknowledgment of paternity made in accordance with Family Court Act § 516-a does not serve as an insuperable bar to a claim of paternity by one who is a stranger to the acknowledgment.” (Id.) This language and concept has been cited with approval by many cases since that have allowed parties not on an acknowledgment to pursue paternity petitions. (See e.g. Matter of Antony S.N.T. v Rosemarie B.T., 123 AD3d 835 [2014]; Matter of Thomas T. [Luba R.], 121 AD3d 800 [2014]; Matter of Marquis B. v Rason B., 94 AD3d 883 [2012]; see also Matter of Frost v Wisniewski, 126 AD3d 1305 [2015] [which without such direct analysis of this aspect of the issue authorized a paternity action notwithstanding the existence of an unchallenged acknowledgment of paternity executed by another man].)
While in accordance with this line of cases Family Court judges have at times issued orders of filiation to other fathers notwithstanding the failure to vacate an acknowledgment of paternity, the resulting situation is not entirely satisfactory. This frustration arises because the original signatory to the acknowledgment has an outstanding recognition of legal fatherhood that has the same force and effect of an order of filiation or paternity. And if the acknowledgment has not been vacated, a child can be left in an ambiguous situation with two potential fathers. Additionally, the situation has an impact on the actual father who may be willing to step up and take responsibility.
This is graphically illustrated by Emily’s case. Mr. C., while otherwise engaged to take moral and financial parental responsibility for Emily, has been reluctant to take appropriate steps to finalize his legal status out of an honest legal and emotional concern about “the other guy.”
• Furthermore, these ambiguities have had an impact on orderly court procedure. For seven years now, this family is *334 still trying to get filiation straight, for Emily’s sake. The necessity to have court proceedings with a signatory of an acknowledgment present in court and willing to proceed hampers the productive processing of the case. Here, the parties were before this court in 2009, but a petition was dismissed before it could be finalized. A second petition was brought by Mr. R. himself later in 2009, but he did not follow through. In 2014 and 2015, additional proceedings were conducted by the Support Magistrate, who, in a perhaps well-meaning and well-intentioned course of action, handled the situation by issuing several adjournments, during which he took doubtful and sometimes contradictory positions, all generated by the lack of clarity in the law. Eventually, Mr. R. stopped appearing, and it has been difficult to obtain jurisdiction over him for the necessitated new petition filed by the Attorney for the Child.[1] This major hurdle could have been avoided if the other cases proceeded during the times that Mr. R. participated.
The Attorney for the Child therefore argues that this court has authority to entertain the child’s paternity proceeding and enter an order adjudicating Mr. C. to be Emily’s father, despite the existence of the acknowledgment of paternity. The court in Marquis B. expressly held that, since the petitioner claimed to be the child’s father, he had standing pursuant to Family Court Act § 522 to challenge the ultimate issue of the child’s paternity. As section 522 also empowers the child with standing and authority to originate a paternity proceeding, a similar result should obtain. Since the child is the person most affected by an order of filiation, and the child has statutory authority to bring a paternity action, these provisions would be meaningless if the child herself were stymied by the existence of an outstanding acknowledgment of paternity that she was powerless to challenge.
In matters concerning filiation, it is the child’s best interests which are of paramount concern. “[T]he chief purpose of [a] paternity proceeding is to secure the health, welfare and happiness of the child” (Matter of Ettore I. v Angela D., 127 AD2d 6, 14 [1987] [internal quotation marks omitted]). It is because of the “need for finality, stability, and consistency in family determinations” that the Frost court ruled that the paternity petition be heard notwithstanding an acknowledgment of paternity (126 AD3d at 1306).
*335 The record is clear in this case that it would be in Emily’s best interests to adjudicate the correct man to be her father.
Under the current circumstances she is locked into a legal status in which she has a “legal father” whom everyone agrees is not her biological father, who does not support her, and who does not wish to pursue a relationship with her. He has twice filed petitions where under oath he swore that he was not Emily’s father, and the mother never opposed those applications. He further has so little concern for Emily’s well-being and future that he chose not participate in the latest proceedings after January 2015 nor comply with court-ordered DNA testing.
At the same time, it is clear that Mr. C. wants to be adjudicated her father. Without such an order, he would be under no legal obligation to pay child support, and have no legal right to visitation with her. In the event of Mr. C.’s death, Emily would have no right to inheritance or to secure Social Security benefits or similar programs.
Additionally, Emily wants to have her true father’s surname, C. Emily considers Mr. C.’s other children her siblings and desires a closer relationship with them. She does not want to remain saddled with Mr. R.’s surname.
To leave the acknowledgment of paternity in place would also create ambiguities in situations where a child might need a legal father’s consent or even just his signature on an application for important matters, such as a passport or college financial aid forms. Thus, Emily’s well-being would be jeopardized if Mr. R. were still legally recognized as her father.
While the parties have elected not to address the equitable estoppel issues,[2] some of the factors that inform equitable estoppel analysis in paternity cases are present here. Emily has had no relationship with Mr. R. for most of her life, while Mr. C. has nurtured and developed a parent-child relationship. To rupture that relationship because of some unworkable legal strictures would have a deleterious emotional impact on the child.
Accordingly, for the variety of reasons set forth herein, this court feels comfortable entering an order of filiation to Mr. C. and vacating the acknowledgment of paternity and severing *336 ties of filiation for Mr. R. under the circumstances of this case and based on the law as it now stands. The line of cases that find no insuperable bar to the filing of a paternity petition in acknowledgment of paternity cases (supra) support this result. The authorization that Family Court Act § 522 grants to the child to bring a paternity proceeding herself supports it. While a literal reading of section 516-a might indicate the need for a formal application by a signatory to vacate an acknowledgment, here there can be said to be the functional equivalent of the assertion of such a claim — Mr. R. on two occasions did bring actions to vacate the acknowledgment which were disposed of before final rulings could be made; the mother, a signatory to the acknowledgment, while she is not a formal petitioner here, supports the application; and the failure of Mr. R. to appear in these latest proceedings, while served and given ample opportunity to appear, allows me to take an adverse inference against him. Furthermore, the factual record, albeit not of a fully evidentiary nature, starting from the private DNA test, the statements made under oath by the mother and Mr. C. in the various court proceedings, and by Mr. R. in his sworn filings, also support a finding that there was a material mistake of fact in executing the acknowledgment of paternity. And most significantly, the best interests of the child and the need for stability and regularity in her life also gives legal authority to support the vacatur of Mr. R.’s filiation and the award of paternity to Mr. C. (see e.g. Frost).
Given the ambiguities of the statutory scheme as it impacts practice and procedure, I write this decision so that attention might be paid for consideration by appropriate authorities to future refinements of the practice and the statute.

. The professional process server utilized by The Children’s Law Center needed to exercise many aggressive and creative attempts to track Mr. R. down, as detailed in the papers.

. And because of the factual record developed and the procedural and strategic course charted by counsel during the proceedings in my Part, we need not reach such issues nor order DNA tests.