Matter of Michael S. v Sultana R. (2018 NY Slip Op 05404)





Matter of Michael S. v Sultana R.


2018 NY Slip Op 05404


Decided on July 19, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 19, 2018

Sweeny, J.P., Manzanet-Daniels, Gische, Kahn, Oing, JJ.


5705 5704

[*1]In re Michael S., Petitioner-Appellant,
v
Sultana R., Respondent-Respondent.
In re Michael S., Petitioner-Respondent,
v
Sultana R., Respondent-Respondent.


Lance Dandridge, Jamaica, for Michael S., appellant/respondent.
Daniel R. Katz, New York, attorney for the child, appellant/respondent.



Order, Family Court, Bronx County (Llinet Rosado, J.), entered on or about December 15, 2015 (December 15 Order), which, to the extent appealed from, granted the motion of the attorney for the child to vacate an order of filiation, same court (Ann Marie Loughlin, S.M.), entered on or about October 24, 2012, declaring petitioner to be the child's father and vacating an acknowledgment of paternity executed by nonparty Jose Antonio C. (JAC); reinstated the Acknowledgment of Paternity; and dismissed petitioner's custody/visitation petition as premature, reversed, on the law and the facts, without costs, the attorney for the child's motion denied, the order of filiation reinstated, the acknowledgment of paternity vacated, and the custody and visitation petition reinstated. Order, same court (Sidney Gribetz, J.), entered on or about March 17, 2016 (March 17 Order), which denied the attorney for the child's motion to vacate the court's prior order, entered on or about June 18, 2012, finding, after a hearing, that equitable estoppel did not preclude DNA testing in the paternity proceeding, affirmed, without costs.
I. Factual and Procedural Background
This appeal involves a complex series of proceedings in Family Courts located in two counties before multiple judges, support magistrates and referees over a period of nearly eight years. Accordingly, a review of the factual and procedural history of the proceedings is required in order to place the legal questions presented in proper context.
Petitioner and respondent were intimately involved from approximately July 2007 until August 2008 while both were residing in Pennsylvania, during which time respondent became pregnant with the subject child, G. During the pregnancy, petitioner and respondent separated.
Another man, JAC, with whom respondent had been intimately involved prior to the commencement of his incarceration on February 6, 2006 and who is the father of respondent's two older daughters, renewed an intimate relationship with respondent upon his release from prison on July 11, 2008. On October 10, 2008, G. was born. The following day, October 11, 2008, JAC and respondent executed an acknowledgment of paternity naming JAC as G.'s father.
Petitioner, having been convicted of possession of heroin
with intent to sell in Pennsylvania, had been sentenced to serve a term of incarceration in a Pennsylvania correctional facility but had obtained the permission of the Pennsylvania court to [*2]postpone his surrender date to enable him to be present for the birth of his child. He then came to New York on October 9, 2008, and on the following day, spoke with respondent's mother, who told him that his daughter had been born that day in the Bronx, but did not specify the name or location of the hospital in which the birth had taken place.
In November 2008, petitioner began to serve his sentence in a Pennsylvania correctional facility. Sometime prior to July 27, 2011, petitioner was released from custody.
On July 12, 2010, petitioner, while still incarcerated in Pennsylvania, filed the instant paternity petition in Family Court, Queens County. The proceeding was subsequently transferred to Family Court, Bronx County.
On October 8, 2010, respondent filed a family offense petition in Family Court, Bronx County against petitioner. According to the March 17 order, the petition alleged actions taken by petitioner and his family members during the time he was incarcerated. The court issued a temporary order of protection against petitioner and transferred the matter to the Honorable Alma Cordova.
On November 22, 2010, the instant paternity proceeding was heard for the first time in Family Court, Bronx County, before Family Court Support Magistrate Mary Neggie. Thereafter, the proceeding was transferred to Family Court Support Magistrate Ann Marie Loughlin (the SM). For reasons not ascertainable from the record, the proceeding was subsequently adjourned multiple times.
On March 29, 2011, a court appearance took place in the instant proceeding before the SM. Petitioner appeared by telephone but respondent did not appear. The appearance was adjourned to May 27, 2011, with the SM stating on the record that respondent's failure to appear would result in a warrant for her arrest.
According to both Judge Rosado's December 15 order and Judge Gribetz's March 17 order, on May 27, 2011, both petitioner and respondent appeared before the SM. During that appearance, respondent conceded before the SM that petitioner is G.'s biological father, but also asserted that G. has only known JAC to be her father [FN1]. According to the December 15 Order, the SM listed JAC as an "interested party" in the paternity proceeding.
On May 31, 2011, the SM assigned counsel to act as the attorney for the child (AFC).
On July 19, 2011, at a court appearance before the SM at which the AFC and respondent appeared in person and petitioner appeared by telephone, the AFC reported that G. was "very closely attached to her two sisters and to her father," whom G. believed was JAC. The AFC further asserted that she would oppose any DNA testing of petitioner and G.
During the July 19, 2011 appearance, the SM stated that issues had been raised in the paternity proceeding as to whether petitioner was estopped from any further pursuit of that proceeding and whether DNA testing could proceed. The SM, apparently referring to her own lack of authority to determine those issues, opined that they would have to be referred to a judge for determination.
At that same appearance, petitioner stated that respondent had been keeping G. away from him for years, and that he had sent money orders to respondent's mother which he had intended to be used for the financial support of G., but that respondent had returned the money orders to him. He further stated that he "actually kn[e]w" that G. was his child.
At the conclusion of the July 19, 2011 appearance, the SM adjourned the proceeding to July 27, 2011, with the understanding that petitioner would be able to appear personally on that date. She further directed respondent to produce G.'s birth certificate on the adjourned date.
On July 27, 2011, at a court appearance before the SM at which the AFC, petitioner, his counsel, and respondent (without counsel) appeared in person, the AFC argued that petitioner [*3]should be estopped from asserting paternity. The SM again stated that she had no authority to determine that issue and referred the estoppel issue to the Honorable Sidney Gribetz for determination. Upon such referral, the court assigned counsel to represent respondent and adjourned the proceeding to September 21, 2011.
On September 21, 2011, JAC appeared before Judge Gribetz, who assigned counsel to JAC "upon consideration that [he] would be a necessary party." JAC's assigned counsel accepted service of the paternity petition in court. The proceeding was adjourned to December 5, 2011 for an estoppel hearing.
On December 5, 2011, petitioner and respondent appeared in person before Judge Gribetz, with their respective counsel. The AFC also appeared in person, and counsel for JAC appeared by telephone. Petitioner's counsel successfully moved to be replaced by petitioner's assigned counsel in the family offense proceeding. The estoppel hearing was adjourned to February 28, 2012 to accommodate new counsel.
On January 27, 2012, the family offense proceeding continued before the Honorable Alma Cordova. Based upon findings that petitioner was guilty of committing attempted assault, harassment, and disorderly conduct, the court issued a two-year order of protection against petitioner.
On February 28, 2012, the AFC appeared before Judge Gribetz in the instant paternity proceeding. Counsels for petitioner, respondent and JAC also appeared, without their respective clients. At this appearance, counsel for JAC referred to his client as an "interested party." Counsel for respondent stated that his client had moved to Florida and requested that she be permitted to participate in the proceedings by telephone. Counsel for JAC joined in that application on behalf of his client, noting that JAC had also moved to Florida to live with respondent, and stating that he had spoken to JAC and that he, too, wished to participate by telephone. Petitioner's new counsel, appearing for the first time in this proceeding and noting that he had not received a copy of the petition, objected to the requests for telephonic participation and requested that respondent appear in person in order to be available for cross-examination before the court. The court granted petitioner's counsel's request and adjourned the proceeding to June 18, 2012 in order to allow counsel for respondent and JAC to notify their respective clients and arrange for them to appear in person, as well as to accommodate petitioner's counsel.
On June 18, 2012, the AFC, petitioner and his counsel appeared before Judge Gribetz. Counsel for respondent and JAC also appeared, but without their respective clients. Counsel for respondent stated that his client did not have the funds to travel from New York to Florida and that he had attempted to arrange for her participation by telephone but that she did not have enough money to pay for her own cellular telephone service. Counsel for JAC stated that both respondent's and JAC's cellular telephones appeared to be disconnected.
Judge Gribetz then proceeded to hold a hearing on the issue of whether petitioner was equitably estopped from any further pursuit of his paternity proceeding, with petitioner as the sole witness. Counsel for respondent and JAC were present at the hearing but did not participate in the absence of their respective clients. Petitioner testified that he came to New York from Pennsylvania on October 9, 2008 and on the following day, October 10, 2008, called respondent's mother. He further testified that respondent's mother told him that his daughter had been born that day in the Bronx, but had not specified at which hospital the birth had taken place. Petitioner further testified that he then received a call from JAC, who told petitioner that he was not allowed to be a part of G.'s life and refused to give him any information about her. Petitioner further testified that respondent had told him many times that G. was his child and that he had accompanied her on her medical appointments while both of them were living in Pennsylvania. In addition, petitioner testified that after he was released from prison, he sent money orders to respondent's mother in an effort to provide financial support for G., but that respondent had the money orders returned to him. The money orders in question were introduced into evidence at the hearing.
Petitioner further testified that he received a letter, signed "Chino AKA Assassin," which petitioner believed to be from JAC, stating that the author of the letter was handling the financial [*4]needs of respondent and G. and that petitioner need not be concerned. Although the court ruled that it had not been established that the letter was from JAC, the court permitted the letter to be introduced into evidence.
Counsel for petitioner argued that although petitioner had a "checkered past," he had redeemed himself and worked legitimately as a steamfitter and was a union member. In that regard, petitioner testified that, at the time of the hearing, he was employed as a steamfitter at the World Trade Center in Manhattan, adding that he was married and had three stepchildren. He further testified that shortly after his 2008 drug possession conviction, he made a request before the Pennsylvania judge to postpone commencement of service of his sentence for a month so that he could be present at his daughter's birth, and that the judge had granted his request, enabling him to make the trip to New York on October 9, 2008.
At the conclusion of the hearing, Judge Gribetz did not rule on the question of paternity, finding that the limited issue presented was whether petitioner could be estopped from pursuing the paternity proceeding. On that issue, the court opined that the parties seeking estoppel of petitioner had an affirmative duty to present evidence that estoppel of petitioner was in the best interests of the child. The court drew an inference against respondent and JAC for what it found to be their willful failure to appear at the estoppel hearing or to request permission to provide electronic testimony. The court further found that respondent, JAC and the AFC had not met their burden of presenting evidence that estoppel of petitioner was warranted by any actions or inactions on his part that were detrimental to G., such as failing to assert his paternity in timely fashion or causing psychological harm to G. Taking judicial notice of the family offense petition proceeding before Judge Cordova, the court opined that the factors to be weighed in assessing petitioner's character "cut[] both ways." Having found no evidentiary support for estoppel, the court ordered DNA testing of petitioner. The court further ordered respondent to produce G. for DNA testing and transferred the matter back to the SM and calendared it for August 20, 2012 to receive the results of the DNA testing and for further proceedings, leaving resolution of further procedural issues and the issue of the validity of the acknowledgment of paternity to her discretion. The court also relieved counsel for JAC, leaving the matter of whether counsel for respondent and the AFC were to appear before the SM to their discretion. The AFC stated on the record that she believed that she had to remain on the case. DNA testing was never completed because respondent never made G. available for testing, however.
On July 19, 2012, petitioner commenced a separate proceeding in Family Court, Bronx County seeking joint custody and visitation. This matter was initially assigned to Referee Sue Levy.
On August 14, 2012, according to the March 17 order, at the first appearance in the joint custody/visitation proceeding, Referee Levy noted that the court had served respondent at a confidential address maintained by the court and that service had not been returned.
According to the December 15 order, on August 20, 2012, the paternity proceeding first appeared on the SM's calendar for DNA testing. At the next appearance before the SM on September 20, 2012, at which only the AFC and counsel for petitioner appeared, the SM stated on the record that a DNA sample was to be drawn from G. on September 24, 2012. The SM then inquired why counsel for respondent hadn't appeared, and the AFC responded that she presumed that counsel for respondent was relieved when the proceeding was transferred back to the SM and that respondent was unrepresented at that time. The SM adjourned the proceeding to October 24, 2012 and directed that the court notify respondent accordingly.
On October 24, 2012, only the AFC, petitioner and his counsel appeared in the paternity proceeding before the SM. Petitioner's counsel submitted to the SM a certified copy of the transcript of the May 27, 2011 proceeding, which reflected that respondent had admitted that petitioner is the biological father of G. Petitioner then waived both DNA testing and trial. At petitioner's counsel's request, the SM then held an inquest with petitioner as the sole witness, at which petitioner testified to being the biological father of G. After the inquest, the SM, having reviewed the certified transcript reflecting respondent's admission that petitioner is G.'s biological father, ruled that the birth certificate, dated October 14, 2008, four days after G.'s birth, and the acknowledgment of paternity were "invalid" and that respondent had "committed [*5]fraud." Petitioner's counsel then argued that respondent's conduct was not only fraudulent, but "egregious," and the SM interjected that there was no "need to go into all of that because that's already been decided by the Judge upstairs." The SM then entered an order of filiation naming petitioner as G.'s father, amended G.'s birth certificate accordingly and stated that petitioner could proceed to file a custody petition. The SM then issued an order vacating the acknowledgment of paternity naming JAC as G.'s father.
According to the December 15 order, on December 5, 2012, Referee Levy issued a warrant for respondent in the custody/ visitation proceeding.
On May 6, 2013, at an appearance in the custody/visitation proceeding at which the Honorable Llinet M. Rosado presided for the first time, and at which respondent and JAC failed to appear, the AFC continued to request that the court dismiss the proceedings because respondent and G. lived in Florida with JAC and G.'s two step-siblings.
On October 29, 2013, based on respondent's continued failure to appear, petitioner filed a supplemental petition, for a writ of habeas corpus, which Judge Rosado granted.
On April 1, 2014, after numerous adjournments, respondent finally appeared, by telephone, for the first time in over a year, and Judge Rosado vacated the warrant. Judge Rosado then adjourned the matter for a "collateral estoppel" hearing. The court further adjourned the matter a number of times over the following years for reasons not apparent from the record, and ultimately the "collateral estoppel" hearing was calendared for July 22, 2015.
On July 17, 2015, the AFC filed an order to show cause,
referencing both the paternity and custody/visitation proceedings, returnable before Judge Rosado on July 22, 2015, seeking vacation of the SM's October 24, 2012 order of filiation naming petitioner as father, reinstatement of the acknowledgment of paternity naming JAC as father, addition of JAC as a "necessary party" in the paternity proceeding, dismissal of the custody/visitation petition and estoppel of petitioner from undertaking any further action in either proceeding.
On July 22, 2015, petitioner, his counsel, respondent, her new counsel and the AFC appeared before Judge Rosado. At the appearance, the court stated that JAC had never been served with any notice of the October 24, 2012 proceeding at which the SM entered the default order of filiation naming petitioner as the father and vacated the acknowledgment of paternity. Counsel for petitioner submitted an affirmation in opposition to the AFC's order to show cause, asserting that Judge Gribetz's June 18, 2012 decision was law of the case and could not be revisited. The matter was adjourned to October 26, 2015 to allow counsel for the parties time to offer further submissions.
On October 26, 2015, petitioner, respondent, their respective counsels and the AFC appeared before Judge Rosado. In an oral ruling, the court granted the AFC's application for vacation of the order of filiation, reinstatement of the acknowledgment of paternity and dismissal of the custody/visitation petition without prejudice. The court did not rule on the issue of estoppel of petitioner, finding that the issue should be presented to Judge Gribetz, who had previously addressed it.
Judge Rosado's oral ruling was followed by issuance of the December 15 order. That order sets forth in further detail Judge Rosado's factual findings and legal conclusions, including that JAC should have been joined as a necessary party; that respondent's admission that petitioner was the biological father and the impossibility of JAC's biological paternity given that he was incarcerated at the time of G.'s conception were insufficient grounds for vacation of the acknowledgment of paternity; that because petitioner was not a signatory on the acknowledgment of paternity, he had no standing to challenge it; that the acknowledgment of paternity cannot be vacated without fully exploring the best interests of the child; that no petition to vacate the acknowledgment of paternity had been filed; that JAC was never served in the paternity proceeding; that from October 24, 2012, when the order of filiation was issued to December 20, 2012, when the acknowledgment of paternity was vacated, G. had two legal fathers; and that, with respect to the AFC's seeking estoppel of petitioner from further action, Judge Rosado could not grant such relief, and any application for such relief must be made before Judge Gribetz, in light of his previous ruling on that issue.
On January 5, 2016, the AFC moved before Judge Gribetz for vacation of his June 18, 2012 estoppel ruling. In the alternative, the AFC sought reinstatement of her request for estoppel of petitioner from taking any further action in the paternity proceeding.
On January 19, 2016, the return date of the AFC's motion, the AFC, petitioner and counsel for the petitioner appeared before Judge Gribetz. Counsel for respondent did not appear due to illness, and neither respondent nor JAC appeared in person. Judge Gribetz adjourned the matter to March 17, 2016 for issuance of his decision and for the appearance of respondent, her counsel and JAC.
On March 17, 2016, Judge Gribetz issued his written decision denying the AFC's motion. The court reasoned that its June 18, 2012 estoppel ruling was law of the case; that all parties had notice of the June 2012 appearance, yet respondent and JAC chose not to appear; that the AFC had no grounds to seek to vacate the June 2012 on the grounds of excusable default, as she was not in default at the estoppel hearing; that any request to vacate based upon respondent's or JAC's default would fail because such a motion would have to be made within one year from the original ruling and, in any event, there was no showing of an excuse for their default; and that since the court's ruling of no grounds for estoppel stands, the DNA testing was properly ordered and the SM's default paternity hearing (based upon the failure of respondent to comply with the DNA testing order) was properly held.
II. Discussion
The Family Court (Rosado, J.) improperly granted the AFC's motion to vacate the order of filiation. Contrary to petitioner's contention, an AFC has standing, as the child's advocate, to seek vacation of an order of filiation (see Matter of Emily R. v Emilio R., 53 Misc 3d 325 [Family Ct, Bronx County 2016, Gribetz, J.] [granting the AFC's petition to vacate an acknowledgment of paternity]). Nevertheless, in this case, the AFC chose an improper vehicle for challenging the default order of filiation by moving to vacate that default order, as the AFC fully participated in all aspects of the litigation of the instant proceeding. Rather, the proper procedural method the AFC could have pursued in challenging the default order issued pursuant to the SM's October 24, 2012 ruling was to have appealed that ruling.
The court concluded in the December 15 Order, upon its review of the record in the paternity proceeding, that JAC, respondent mother's husband, had not been joined as a necessary party prior to the 2012 hearing on equitable estoppel and that there was no affidavit indicating he was served. However, the record reveals, as the court correctly found in the March 17 order, that JAC appeared in the paternity proceeding in person on September 21, 2011, at which appearance he accepted service, and that his assigned counsel appeared via telephone on December 5, 2011 and was also present at the estoppel hearing. And although the court relieved JAC's counsel at the conclusion of the estoppel hearing, counsel was not precluded from contacting JAC to notify him as to the date of the next appearance before the SM. Thus, while it would have been a best practice to join JAC as a necessary party (see Matter of Isaiah A.C. v Faith T., 43 AD3d 1048, 1048-1049 [2d Dept 2007]), the record reveals that he was treated as a necessary party by the estoppel court. Thus, under these circumstances, it is of no moment whether JAC was formally joined in the proceeding as a "necessary party" or an "interested party." JAC was aware of the proceeding and had an opportunity to be heard, yet chose not to appear in person before the court after his September 2011 appearance, including for the estoppel hearing, and made no attempt to participate (see Matter of Jason E. v Tania G., 69 AD3d 518, 518-519 [1st Dept 2010] [finding that, even though the appellant was "never formally named as a party, the record establishes that he was served with the petition," as well as represented by counsel]).
Moreover, upon referral of the proceeding back to the SM following the estoppel hearing, JAC continued to be considered a party to the proceeding and, as such, was given several adjournments and a full opportunity to appear before the SM prior to the SM's issuance of the order of filiation and vacation of the acknowledgment of paternity. The record reveals that the SM calendared four adjourned dates for respondent to appear and make G. available for DNA testing, but respondent failed to appear. Thus, under the circumstances, where respondent conceded petitioner's paternity, prompting petitioner to waive DNA testing and trial, the SM acted properly in holding an inquest and issuing the order of filiation. Thereafter, no party timely [*6]appealed from the order of filiation (see Family Ct Act § 1113) and neither respondent nor JAC timely moved to vacate their defaults in the paternity hearing (see CPLR 5015[a][1]). Under these circumstances, the order of filiation is considered final (see Matter of Kelley C. v Kim M., 278 AD2d 893, 893 [4th Dept 2000]). Thus, any challenge to the SM's order is barred by res judicata and the order could not be collaterally attacked by the AFC's motion to vacate.
Although petitioner was not a signatory to the acknowledgment of paternity, he had standing under Family Court Act § 522 to attack it, as he had commenced a paternity proceeding (see Matter of Stephen N. v Amanda O., 140 AD3d 1223 [3d Dept 2016]). The acknowledgment of paternity was vacated (albeit not simultaneously with the issuance of the order of filiation) not only in order that the child not have two legal fathers, but also because the SM had found that JAC and respondent engaged in fraud in the execution of the acknowledgment of paternity, which is a valid basis for vacatur of an acknowledgment of paternity (see Family Court Act § 516-a[b][ii]).
Furthermore, under the circumstances, the SM properly issued the order of filiation. As both Judge Gribetz and Judge Rosado found, confirming the SM's own recollection and review of the certified transcript of the proceedings, respondent conceded in open court on May 27, 2011 that petitioner was the biological father. As the December 15 Order indicates, Judge Rosado's finding was based upon the court's review of a certified copy of the transcript of the May 27, 2011 proceeding provided to the SM during the October 24, 2012 appearance. On the basis of respondent's previous concession that petitioner was the biological father, as well as petitioner's own representation to the same effect, the SM properly adjudicated petitioner the father of G.
Our dissenting colleague makes much of both Judge Gribetz and Judge Rosado having found petitioner's evidence that JAC was incarcerated at the time of G.'s conception unpersuasive on the issue of whether only petitioner could be G.'s biological father because JAC could have been released on weekend passes and could have had access to respondent at such times. As there is no record evidence in support of that theory, it is based on nothing more than sheer speculation, however. Moreover, our dissenting colleague's contention ignores the fact that both Judge Rosado and Judge Gribetz found persuasive respondent's concession in open court that petitioner was G.'s biological father.
Judge Gribetz properly denied the AFC's motion to vacate the court's 2012 estoppel order. The AFC did not appeal from the 2012 order, and the time to appeal has long expired (see Family Ct Act § 1113). Moreover, neither respondent nor JAC ever sought to vacate their defaults in appearing at the estoppel hearing (see CPLR 5015[a][1]). Under the circumstances, the Family Court properly determined that the order is final (see Kelley C., 278 AD2d at 893).
The dissent's assertion that the AFC has the right to bring any motion that seeks relief from an order that affects her client does not take into account the fact that the AFC had the opportunity to challenge the 2012 estoppel order in a timely fashion, but waited three years to do so.
The dissent's reliance upon Melendez v City of New York (271 AD2d 416 [2d Dept 2000]) in support of its argument that this Court has the authority to vacate the 2012 estoppel order and the order of filiation in the "interest of justice" is misplaced, as that case neither pertains to the Family Court Act nor to the interest of justice in the context of family law. Assuming, without deciding, that this Court may afford relief "in the interest of justice" in a family law case, notwithstanding that the dissent cites no case so holding, such relief is not warranted in this case.
Furthermore, while we recognize the significance and continuing vitality of the doctrine of equitable estoppel in family law matters, as demonstrated by Matter of Shondel J. v Mark D. (7 NY3d 320, 327 [2006]) and its progeny (see Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 21 [2016]; Matter of Commr. of Social Servs. v Julio J., 20 NY3d 995, 997 [2013]; Matter of O. v M., 19 NY3d 828, 830 [2012]), there is no basis to apply the doctrine here, where petitioner has consistently and diligently asserted his paternity; attempted to visit the hospital in time for G.'s birth; attempted to support G. financially; commenced proceedings and consistently appeared in court by telephone or in person, as he was able. By contrast, JAC failed to appear in court in person after September 21, 2011, and failed to appear by his counsel or any other means [*7]in any proceeding after June 18, 2012. Moreover, any delay in bringing the paternity proceedings to a conclusion is not attributable to petitioner, but to respondent and JAC, who failed to appear in court on numerous occasions, and to the AFC, who waited three years before challenging the 2012 estoppel order.
Moreover, contrary to our dissenting colleague's view, this is not a case where a man may be estopped from claiming to be a child's biological father on the basis of his acquiescence to the establishment of a strong parent-child bond between the child and another man (cf. Matter of Stephen N. v Amanda O., 140 AD3d at 1224). Here, petitioner's efforts to establish his paternity were far from acquiescent. Petitioner sought, and was granted, leave to postpone commencement of his prison sentence for one month in order to allow him to be present at G.'s birth. When he arrived in New York on October 9, 2008 for that purpose, he called respondent's mother, who told him that his daughter had been born but did not disclose the hospital in which the birth had taken place. He was then contacted by JAC, who made clear to him that petitioner should have nothing to do with G. Undaunted by these incidents, upon entering prison, he attempted to send money orders to respondent which he intended for G.'s support, but the money orders were returned to him. While still in prison, he commenced the instant paternity proceeding, consistently appearing before the court by telephone and, upon his release from prison in July 2011, in person. And, approximately one month after the June 2012 estoppel ruling was issued, petitioner commenced the custody/visitation proceeding, repeatedly appearing in person and ultimately hiring private counsel in that proceeding, as well.
Although our dissenting colleague's concerns about petitioner's character and fitness for parenthood are supported by the record, any impact that there may be on G. in bringing petitioner into her life at this time, and whether and to what extent granting petitioner any joint custody or visitation rights would be in the best interests of the child, may properly be addressed in the custody/visitation proceeding.
We have considered the remaining arguments and find that they are either academic or unavailing.
All concur except Gische, J. who dissents in a memorandum as follows:




GISCHE J. (dissenting)
 I respectfully dissent because I disagree with the majority's view that petitioner established paternity sufficient to have standing to seek custody and visitation of the subject child (G.). I believe that the order entered on default, precluding G. from


establishing estoppel, should be vacated because the undisputed facts establish that petitioner acquiesced in G. establishing a parental relationship with the mother's husband (JAC) during the first two years of G.'s life (Matter of Shondel J. v Mark D., 7 NY3d 320, 327 [2006]). I further believe that the record, including petitioner's own testimony, actually supports estoppel. Accordingly, I would reverse the order of Family Court (Sidney Gribetz, J), dated March 17, 2016, denying the attorney for the child's (AFC) motion to vacate the order, issued on default, finding that there is no basis for estoppel, and grant the AFC's further request to permanently estop petitioner from proceeding on his paternity claim. I would likewise affirm the order of Family Court (Llinet Rosado, J), dated December 11, 2015, vacating the Support Magistrate's order of filiation in favor of petitioner, also issued on default.
This is an almost eight-year-old proceeding with a convoluted procedural history. It has been presided over by four different Family Court Judges in two different boroughs, three Support Magistrates and one Referee. Crucial orders denying G.'s estoppel defense and establishing petitioner's paternity were each issued on default. These orders effectively permitted petitioner, an admitted stranger to the child, to now seek custody and visitation.
As will be more fully set forth below, even if an individual review of each appealed order is somehow legally sustainable, it is difficult to understand how the cumulative effect of the orders serves the best interests of the particular child whom they concern. Petitioner admittedly had nothing to do with G. and did not financially support her for the first two years of her life, [*8]knowing all the while that JAC, the mother's husband, acknowledged paternity of G., supported her and raised her as his own child, in an intact family that included the mother and their other children, who G. considers her only siblings. Given the admitted facts favoring estoppel, the scant record on actual paternity, and procedural irregularities in the Support Magistrate's order of filiation in favor of petitioner, this case cries out for this court to exercise its inherent power to address and rectify the errors and grant relief in its discretion and in the interest of justice (see e.g. Melendez v City of New York, 271 AD2d 416 [2d Dept 2000]). G. should not have to undergo the trauma of a needless custody and visitation hearing involving petitioner, who is a complete stranger to her. Her status as JAC's child should be protected (Shondel J., 7 NY3d at 327).
Petitioner and G.'s mother were never married, but were involved in an intimate relationship and lived together from July 2007 until August 2008. In August 2008, petitioner told the mother to move out of their apartment; she was seven months pregnant at the time. Petitioner was due to begin a prison sentence close to the baby's due date, but he obtained a short stay of execution of the sentence so he could be present at the baby's birth. Despite that reprieve, and although not yet incarcerated, petitioner did not, in fact, attend G.'s birth on October 10, 2008 because he claims he did not know which hospital the mother gave birth in, although he was familiar with her prenatal care. JAC, however, was at the hospital and present during the child's birth. JAC's surname also appears on G.'s birth certificate and the day after G. was born, JAC and the mother executed an acknowledgment of paternity naming him as G.'s father. On October 21st, the mother and JAC were married. JAC is the father of the mother's older daughters and G.'s siblings, meaning that the mother and JAC were involved in an intimate relationship before she became involved with petitioner. JAC and the mother's relationship did not begin after petitioner and the mother separated. As will be seen, there is the added issue f whether JAC had access to the mother during the time she became pregnant with G., despite his own incarceration. The mother, JAC, G., and her sisters have lived together as a family since G.'s birth.
In July 2010, when G. was already 21 months old, but while petitioner was still in Pennsylvania completing the terms of his sentence, he filed for paternity in Family Court, Queens County. In September 2010, the mother answered the petition and appeared before a Support Magistrate, but petitioner appeared by telephone. The mother told the court that she no longer lived in Queens and that she had moved to a domestic violence shelter. She also told the court that she was "terrified" of petitioner because he had once tried to kill her. Seeing as neither party had any nexus to Queens, the matter was transferred to Family Court, Bronx County and assigned to Support Magistrate Ann Marie Loughlin (SM).
On October 8, 2010, the mother filed a family offense petition against petitioner and members of his family. On January 27, 2012, after a fact-finding hearing, the court (Alma Cordova, J.) found petitioner guilty of committing attempted assault, harassment, and disorderly conduct. The court issued a two-year order of protection against petitioner, in favor of the mother [FN2]. After an initial appearance on November 22, 2010, the paternity proceeding was adjourned several times. At one appearance, on April 29, 2011, petitioner appeared by telephone and the mother telephoned to say she could not appear because there was an emergency with her daughter. The SM adjourned the matter to May 27, 2011, and told petitioner that "if this happens again, sir, it's final. I'm going to proceed without her," adding that a warrant would be issued for the mother's arrest if she did not appear.
On May 27, 2011, the mother appeared in court before the SM. The minutes of this appearance, which was not a testimonial hearing, are apparently no longer available, but at a subsequent appearance, on May 31, 2011, the SM made reference to what the mother had previously stated at the May 27th appearance: "the mother of the child said the Petitioner is the biological father of the child. She doesn't deny that; however, she says the subject child knows her legal husband as her father . . . ." There is no indication of the circumstances under which the May 27th statement was made by the mother or if it was made by her under oath. The mother also made this statement without the benefit of counsel. Petitioner was not physically present at either of these appearances, but was permitted to participate by telephone from Pennsylvania where he was living and continued to live throughout the relevant events at issue in these appeals. At the following May 31st appearance, the SM appointed an AFC for G.
At the next court appearance, on July 19, 2011, the mother and the AFC were present and petitioner once again appeared by telephone. At that appearance, the AFC related to the SM that she had met G., the child was somewhat verbal, and "[s]he is very closely attached to her two sisters and to her father, who as far as she is concerned, is [JAC]." The AFC also reported to the SM that there were "very big" issues of domestic violence involving petitioner and the mother. Stating that G. had never had any contact with petitioner, the AFC objected to G. undergoing any genetic testing because "there [was] no reason to disturb what is already there . . ." The mother told the SM that JAC's name is on G.'s birth certificate, but stated she forgot to bring the document and it would only take her "[10] minutes" to get it, apparently a request for a short break. The SM denied the mother's application, told her to bring the document next time and, stating that the case was a "big mess" because there were estoppel issues, the SM referred the paternity proceeding to a Family Court judge to determine whether equitable estoppel required dismissal of the paternity petition (Family Court Act §§ 418, 439 [b]; see e.g. Matter of Starla D. v Jeremy E., 95 AD3d 1605 [3d Dept 2012], lv dismissed 19 NY3d 1015 [2012]).
The case was assigned to Judge Gribetz, who appointed an attorney to represent JAC [FN3]. At a February 2012 appearance, the attorneys for the mother and JAC informed the court that the family had relocated to Florida. The mother's attorney made an application for his client to call in and appear by telephone, explaining that there were "complexities in this case." JAC joined the application, as did the AFC. Petitioner's attorney, who had just been assigned that morning and represented petitioner in the proceeding for an order of protection, was opposed. He stated that the mother had just "up and left" and should have sought permission before doing so. The mother's attorney disputed that characterization, explaining that the family could no longer afford to live in the Bronx and it was very expensive for the mother to come to court. The mother's attorney stated that petitioner and G. had never met, implying the mother had no obligation to notify petitioner about the move. The court denied the application for a telephone [*9]appearance and scheduled the estoppel hearing for June 18, 2012.[FN4]
At the June 18th hearing, all attorneys appeared, but neither the mother, JAC, nor the child was present. The mother's counsel told the court that he had talked to his client earlier and she informed him she did not have the funds to travel to New York from Florida. The mother's attorney then said he had tried to work out "something" with her, but when he called her again, her phone service had been cut off because "that's how low" her funds were. JAC's phone had been disconnected as well. Petitioner's attorney objected to an adjournment and said he was ready to proceed with an inquest. His application was granted and Judge Gribetz proceeded with an equitable estoppel hearing on default.
Petitioner was the only witness to testify. He testified that he and the mother had engaged in "many" sexual relations while they lived together, the mother had told him the baby was his and that he had gone with her to some of her prenatal doctor visits. Petitioner also testified that although the mother's mother called to let him know that the baby had been born, she did not tell him at which hospital. He did not testify what efforts, if any, he made to locate the baby, such as calling the mother or reaching out to other members of her family with whom he stayed in touch. After he was released from prison, petitioner sent two or three money orders for the baby through the maternal grandmother. One money order was mailed back to him uncashed. Petitioner made no further effort to provide the child with any financial support after the money order was returned to him or before filing for paternity.
While still in prison, petitioner received a letter from someone who used the name "Chino AKA Assassin." The writer assured petitioner that G. was being cared for and not to worry about her. Petitioner testified that he subsequently received a phone call from JAC who told him that he was not allowed to be a part of G.'s life. Since petitioner did not want to start any "conflict," he admitted that he made no effort to visit or contact the child, until this petition was filed. Petitioner also presented evidence that JAC had been incarcerated from February 2006 until July 2008, well beyond the time of G.'s conception.
The AFC did not know in advance of the hearing that the mother would not be appearing and that consequently, her client, the child, would also not be present. The AFC participated in the hearing only to the extent that she cross-examined petitioner and made a closing statement, advocating for the application of equitable estoppel and dismissal of the petition. The AFC stated that she opposed DNA testing because there was an acknowledgment of paternity and a birth certificate, each identifying JAC as the father. The AFC related her observations of G. and her family, stating that there was close bond between G. and JAC, her father. The AFC also argued that petitioner had not met his prima facie burden of proving paternity, but the court responded that "the burden is on the person asserting the estoppel issue to submit to me, to go forward and prove the estoppel."
The court rejected the AFC's statements about JAC's acknowledgment of paternity and birth certificate because certified copies of those documents were not in evidence, although there were photocopies of them. When the court inquired why the AFC had not presented any further evidence of G.'s relationship with JAC, the AFC explained that it was very difficult for her to put forth a case without her then three-year-old client, and because the mother's whereabouts where [*10]unknown, she could not bring her client to court.
In its decision dated June 18, 2012, the court ruled only on the estoppel issue. Although urged by petitioner to do so, the court expressly declined to rule on the underlying issue of paternity. The court drew a negative inference against the mother and JAC because they had not appeared for the hearing. The court stated that they had failed to make a "formal request for [an] electronic testimony hearing..." Although the court took judicial notice of the two-year order of protection issued in January 2012 that was still in effect, the court commented that it "doesn't even mention the baby."[FN5] The court observed that petitioner had turned his life around, and found that petitioner had not "slept on his rights," even though G. was already 21 months old and "no longer a baby" when petitioner first filed for paternity. Notwithstanding petitioner's testimony that he had relations with the mother during the relevant time period, that the mother had admitted to him G. was his child and that JAC was incarcerated at the time of G.'s conception, the court denied petitioner's request that the court also rule declaring petitioner to be G.'s father.
The court stated, in relevant part:
"The issue of estoppel focuses on the child and there's an affirmative duty for them [mother and JAC] to come forward and show that and no one has come forward and shown evidence to me that would support an estoppel so therefore, for the limited purpose that we're doing here, I find there is no estoppel issue that would prevent there being DNA tests. So I am going to order that [mother] produce the child for DNA and I'll order [petitioner] to undergo a DNA test and I'm going to transfer the matter back to the Support Magistrate."
In transferring the case to the SM, Judge Gribetz clarified that his decision was limited to finding that equitable estoppel did not prevent genetic marker testing of G. He cautioned petitioner, however, that once he went before the SM, petitioner would "have [JAC's] acknowledgment of paternity issue to overcome as well," because the only proof of paternity was petitioner's own testimony. Judge Gribetz found unpersuasive petitioner's proof, that JAC could not be G.'s biological father because he was incarcerated during the time the child was conceived. Upon completing the hearing, the court relieved JAC's attorney and told the mother's attorney that he left it to his "discretion" whether he needed to continue representing his client. As for the AFC, Judge Gribetz told her she could "stay on the case if she want[ed to]. If she [felt] so inclined because in addition to the DNA test ... you also have the acknowledgment of paternity issue to overcome as well."
The SM adjourned the paternity hearing several times to allow the mother to produce herself and the child for DNA testing. At a October 24, 2012 appearance, petitioner's attorney asked the SM to enforce Judge Gribetz's order requiring DNA testing. Although petitioner had been tested, neither the mother nor G. had yet been tested. The mother and JAC had also stopped coming to court and they no longer had legal representation because their attorneys were relieved by Judge Gribetz. When the SM told petitioner's attorney that only a Family Court judge could issue a bench warrant for the mother's arrest, petitioner's attorney withdrew his application. He then asked that the SM hold an inquest on paternity instead.
After reviewing the court's file, the SM informed petitioner that the mother "has already admitted on the record that you're the father of this child," adding the following:
"You know you can ask for the D.N.A. We could have a trial, or you could just admit today and say today I believe I'm the father of the child and I would like to be named the legal father of the child."
After petitioner stated "I really know that's my child," and despite the AFC's strenuous objections, the SM granted petitioner's application and proceeded to hold a paternity hearing on default. The SM stated that she could proceed to inquest because petitioner was waiving DNA testing and a trial. The SM never considered the impact of such waiver on the child, the fact that she had not waived such testing, or the fact that such testing was for her benefit as well. After the AFC further objected, and solely based upon JAC being named as the father in G.'s birth certificate and the acknowledgment of paternity, the SM summarily concluded that the acknowledgment of paternity was "invalid," because the mother had "committed fraud," referring to the mother's previous statement, that petitioner was G.'s biological father. The SM then incorrectly added, "that's already been decided by the Judge upstairs," an apparent reference to Judge Gribetz's June 18th estoppel order. Judge Gribetz, however, never ruled that the acknowledgment of paternity by JAC was invalid. Quite the opposite, he recognized that petitioner had the burden of overcoming the acknowledgment of paternity at any subsequent paternity hearing. The SM then vacated JAC's acknowledgment of paternity and subsequently entered an order of filiation, naming petitioner G.'s father. Based on the SM's default order, petitioner filed a custody/ visitation proceeding, which was assigned to a Referee.
On December 5, 2012, the Referee issued a bench warrant for the mother's arrest and on May 6, 2013, the custody/visitation matter appeared before Judge Rosado for the first time, but neither the mother nor JAC appeared. The AFC, however, was present and urged the court to dismiss the petition because of G.'s residence in Florida. In April 2014, after several adjournments, and petitioner filed a writ of habeas corpus, the mother appeared by telephone from Florida, the warrant was vacated and Judge Rosado scheduled a trial for July 22, 2015, which she described as pertaining to the issue of collateral estoppel.
A week before the trial was scheduled to begin, the AFC moved under both the paternity and custody/visitation dockets to vacate the SM's order of filiation, to restore JAC's acknowledgment of paternity, to dismiss the custody petition and for an order staying petitioner from taking any further action in the paternity proceeding. Petitioner opposed the motion and on the return date (July 22, 2015), petitioner, his attorney, the mother, her attorney and G. and the AFC appeared in court. JAC was not present or represented by counsel. At that appearance, the AFC met again with G., who was now almost seven years old.
In her order, dated December 11, 2015, Judge Rosado reviewed the events of the paternity proceeding, as well as the events the led up to the order of protection that Judge Cordoba had issued. Judge Rosado observed that there was no evidence that JAC had been named a necessary party to the paternity petition, although he should have been, nor could she locate any proof of service. Judge Rosado ruled that under those circumstances, the SM was without jurisdiction over JAC and should not have vacated the acknowledgment of paternity. In ruling, the court also observed that the only two people who could have challenged the acknowledgment of paternity on the basis of fraud were the mother and JAC. Judge Rosado, like Judge Gribetz, was unpersuaded by the records petitioner offered as evidence of JAC's incarceration during the relevant period of time when G. was conceived. She stated that it did not prove only petitioner could be G.'s biological father because the terms of JAC's sentence were unknown and JAC could have been released on weekend passes, meaning he would have access to the mother. Judge Rosado then vacated the SM's order of filiation, stating it had been improperly issued. The court also reinstated the acknowledgment of paternity, and dismissed the custody and visitation petition, without prejudice, as premature. Although Judge Rosado also denied the AFC's motion for a permanent stay of the paternity action, she did so without prejudice to the AFC renewing that aspect of her motion before Judge Gribetz.
On or about January 5, 2016, the AFC brought a motion before Judge Gribetz to vacate his June 18, 2012 order and for a permanent stay of the paternity matter. The AFC's asked that such relief be granted in the interest of justice to protect G.'s status in an already recognized and operative parent/child relationship with JAC.
On March 17, 2016, Judge Gribetz denied the AFC's motion. He reasoned that the mother and JAC, had "charted their own procedural course" by absenting themselves from court appearances, and unduly "delayed the litigation of the custody docket for many years." Judge [*11]Gribetz acknowledged that it would have been "better practice" for JAC to have been named a necessary party in the paternity petition, but that such error did not provide a basis for relief because JAC had been appointed an attorney, yet JAC had chosen to stop participating in the proceedings. Judge Gribetz concluded that any concerns the mother and the AFC had about the impact of petitioner's insertion into G.'s life could best be addressed in the context of the custody/visitation hearing, "where to be sure, the best interests of the child' will be of paramount interest." Judge Gribetz found that his 2012 order was based on the record and facts before him at the time of the estoppel hearing and that he saw no reason to hold a second estoppel hearing. Despite expressing a belief that the AFC's motion was "well-intentioned," the court viewed it as a procedurally inappropriate means by which to have him revisit an order that was the law of the case because it had not been timely appealed.
Petitioner appeals from Judge Rosado's order, arguing that the court abused its discretion when it dismissed the order of filiation issued by the SM, because SM's order was res judicata, the AFC lacked standing to move to vacate the SM's order, and the court misapplied the law by finding that petitioner could not challenge the acknowledgment of paternity because he was not a party to it.
The AFC separately appeals from Judge Gribetz's denial of her motion to vacate the 2012 default order denying application of the doctrine of equitable estoppel. She argues that the interests of the child were not considered by the court and that petitioner should be permanently estopped from pursuing his paternity petition any further.
The issues raised by petitioner about standing are addressed to who has the right to seek relief from a judgment or order, not to the legal standard necessary to prevail on the underlying relief sought. I believe the AFC has the right to bring any motion seeking relief from a judgment or order that directly affects the child, her client. CPLR 5015(a) provides that the court "may relieve a party" from a judgment or order "upon such terms as may be just, on motion of any interested person." A child is certainly an interested person in any proceeding concerning that child's paternity. Family Court Act § 522 permits an AFC to institute proceedings on the child's behalf for relief related to the child's paternity (see Matter of v James EE., 203 AD2d 688 [3d Dept 1994]). The chief purpose of a paternity action is "to secure the health, welfare and happiness of the child" (Matter of Ettore I. v Angela D., 127 AD2d 6, 14 [2d Dept 1987]). Since the estoppel order undeniably affected the issues surrounding G.'s paternity, the AFC had standing to seek relief from that order. The AFC also had the right to challenge the SM's order on paternity before a Family Court judge.
The next arguments, raised by petitioner in tandem, are that Judge Rosado erred in vacating the order of filiation because it was res judicata and, in any event, in doing so the court misapplied the law concerning who could challenge an acknowledgment of filiation. Res judicata does not apply and I believe Judge Rosado correctly stated the legal principles applicable to the circumstances before her. Res judicata gives preclusive effect to a prior determination and promotes finality, stability and consistency in family status determinations (Matter of Slocum v Joseph B., 183 AD2d 102 [3d Dept 1992]). A SM's order is not final and is subject to review by a judge of the Family Court (see Family Court Act § 439[e]). Moreover, a filiation order that makes no provision for support constitutes an order appealable as of right (Family Court Act § 1112[a]; see e.g. Matter of Jane PP. v Paul QQ., 64 NY2d 15 [1984]). Since a Support Magistrate's authority is strictly limited, the SM's order was appropriately reviewed by Judge Rosado, a Family Court judge. Petitioner's related argument, that res judicata applies because the AFC appeared at the paternity hearing and zealously represented the child, is a red herring. The appeal of Judge Rosado's order does not implicate whether the AFC competently or zealously represented G.'s interests at the inquest hearing, but whether the Family Court Judge was correct in finding there was no legal basis for the SM's determination (see Matter of H.M. v E.T., 14 NY3d 521, 525-526 [2010]). It is also significant that Judge Gribetz made no order vacating the acknowledgment of filiation, so the doctrine of law of the case, which otherwise applies to decisions by judges of coordinate jurisdiction, does not apply in this case (Sprecher v Thibodeau, 148 AD3d 654, 655 [1st Dept 2017]).
I also agree with Judge Rosado's determination that the SM improperly invalidated JAC's [*12]acknowledgment of paternity on the basis of the mother's purported "fraud." An acknowledgment of paternity has the same force and legal effect as an order of filiation entered after a court hearing. That is in part because the acknowledgment establishes the father's obligation to support the child and responsibilities to him or her (Public Health Law § 4135-b). Only a signatory to an acknowledgment of paternity may challenge it on the basis that it was signed "by reason of fraud, duress, or material mistake of fact" (Family Court Act § 516—a[b]; Matter of Sidney W. v Chanta J., 112 AD3d 950, 952 [2d Dept 2013] [internal quotation marks omitted]). Furthermore, the party to the acknowledgment seeking to have it vacated on the basis of fraud bears the burden of proof (Matter of Oscar X.F. v Ileana R.H., 107 AD3d 795, 795-796 [2d Dept 2013]).
As a nonsignatory to the acknowledgment of paternity, petitioner lacked standing to challenge it on any of those enumerated bases (see Matter of Marquis B. v Rason B., 94 AD3d 883 [2d Dept 2012], lv dismissed 19 NY3d 991 [2012]; see also Richard B. v Sandra B.B., 209 AD2d 139, 144 [1st Dept 1995], lv dismissed 87 NY2d 861 [1995]). The SM misapplied Family Court Act § 516-a, misconstrued Family Court Act § 522, which did not apply anyway, and unnecessarily vacated JAC's acknowledgment of paternity in order to hold an inquest on the merits of the paternity petition (Family Court Act §§ 516-a, 522; see Matter of Tyrone G. v Fifi N., 189 AD2d 8, 15 [1st Dept 1993]; Matter of Thomas T. [Luba R.], 121 AD3d 800, 800 [2d Dept 2014]). A paternity petition, however, is not a collateral attack on an existing acknowledgment of paternity, but an assertion of the petitioning individual's own claim of paternity (see Dennis B. v Edwanai B., 155 AD3d 1027 [2d Dept 2017]; Matter of Thomas T., 121 AD3d at 800). These critical legal principles and distinctions bear on whether petitioner met his burden of proof at the paternity hearing by presenting clear and convincing evidence (Matter of Tanesha H. v Phillip C., 57 AD3d 403 [1st Dept. 2008]). I submit he did not.
By summarily vacating JAC's acknowledgment of paternity, although there was no petition for such relief, the SM sua sponte chose a different father for G., based solely on a statement that the mother made early in the proceeding, well before Judge Gribetz held the estoppel hearing and not in a testimonial setting. There was never any DNA testing of the child to substantiate the mother's statement. Although I am also of the view that DNA testing is not in G.'s best interest, when it became clear that the SM could not proceed in the absence of DNA testing (meaning this was clearly a contested paternity action), the SM was obligated to refer the matter back to a Family Court judge to determine the remedy. The very purpose of DNA marker testing is to establish paternity where it is contested (Family Court Act §§ 418, 532) and petitioner's "admission" of paternity, in view of an acknowledgment of paternity, was insufficient to prove G. is petitioner's biological child. In fact, in 2012 when Judge Gribetz was confronted with almost the identical evidence that was later presented to the SM, he refused to find for petitioner on the issue of paternity. The SM disregarded the court's determination by finding that petitioner's statement obviated the need for such testing. Even if petitioner waived DNA testing, it did not mean that he could prove paternity without the child being tested because there was an existing order by a Family Court judge that it was necessary. Furthermore, the AFC did not waive DNA testing of her client. Although the AFC was opposed to DNA testing from the outset, she recognized that in the absence of an equitable estoppel determination estopping petitioner from going forward with his case, testing would be relevant proof on the issue of paternity.
This sequence of events brings me back to the original 2012 default order denying estoppel and the AFC's present appeal from Judge Gribetz's 2016 order denying her motion that he vacate his prior order and permanently stay the paternity action. I believe Judge Gribetz should have granted the motion in the interest of justice for the following reasons.
Where paternity is at issue, an estoppel claim should be decided first. Furthermore, even if a petitioner claims he engaged in intimate relations with the mother during the period of conception, he may be estopped from asserting paternity if he waited too long to assert his paternity claim (see Matter of Cecil R. v Rachel A., 102 AD3d 545, 546 [1st Dept 2013]). This is also a possible outcome if the child is in an already established parent-child relationship with another individual who provides the child with support, etc. (Shondel J. at 326-327).
Genetic testing of a child to determine paternity "shall" be denied when a court makes a written finding that testing "is not in the best interests of the child on the basis of res judicata, equitable estoppel, or the presumption of legitimacy of a child born to a married woman" (Family Ct Act § 532[a]; see also Family Court Act § 418[a]). In other words, before determining biological paternity, the court has to determine whether equity demands that someone other than the acknowledged parent has a superior right. This is because equitable estoppel precludes a person from asserting a right, whether it is that he is - or is not - a biological parent "after having led another to form the reasonable belief that the right would not be asserted" (Shondel J. at 326). The fact that petitioner is not seeking to avoid paternity, but embracing it, makes no difference. The child's interests are paramount and the court's concern is not whether the parent against whom the doctrine of equitable estoppel will be applied is entirely innocent or blameless of the circumstances implicating consideration of the doctrine (id.).
The elements of estoppel were present in this case from the outset and were immediately brought to the court's attention after the AFC met with G. and her family. The AFC reported that G., who was already a toddler when petitioner filed for paternity, had developed a close relationship with JAC and considered him her father. There was an acknowledgment of paternity by JAC. Petitioner acknowledged the relationship between G. and JAC by testifying that he had been told to stay away, and did so for a while, having been assured the child was being taken care of.
The courts have long recognized that the best interests of a child are served by protecting a child's status in an already recognized and operative parent-child relationship (see e.g. Verra v Bowman-Verra, 266 AD2d 682 [3d Dept 1999]). Here, petitioner claimed that he "knew" he was the child's biological father as soon as he learned of the mother's pregnancy. Notwithstanding that certainty, he delayed in filing a paternity petition until G. was almost two years old, well after G. and JAC had forged a parent-child relationship (Matter of Richard W. v Roberta Y., 240 AD2d 812 [3d Dept 1997], lv denied 90 NY2d 809 [1997]). The acknowledged relationship and bond between JAC and G. was never afforded its due weight when Judge Gribetz decided that petitioner could proceed with his petition and that G. had to undergo DNA testing or when the court later denied the AFC's motion (Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 6 [2010]; see Matter of Fidel A. v Sharon N., 71 AD3d 437 [1st Dept 2010]).
By failing to preserve G.'s paternal bond and relationship with JAC, the only father she has ever known, the court elevated petitioner's interest in being recognized as the child's father over what was in the best interests of the child. The mother's financial situation, her stated fear of petitioner, who once had tried to kill her, and the existing order of protection she had against petitioner were other factors that the court also failed to duly consider in determining the important issue of estoppel on default and subsequently denying the AFC's motion.
G. is now almost nine years old and regards JAC as her father; he is also the father of the mother's older daughters who are G.'s siblings. Under those circumstances, the court could have declared that JAC was G.'s father, irrespective of petitioner's biological fatherhood (Shondel J. at 330).
DNA testing appears to have been ordered primarily, if not solely, because the mother and JAC did not participate in the estoppel hearing. Petitioner's own testimony, however, shows that he waited almost two years after the child was born before asserting paternity, although he "knew" G. was his daughter, thereby permitting JAC, the mother's husband, to assume and accept all responsibility for G.'s upbringing and support (Ettore I., 127 AD2d at 9). The prison sentence he was completing provides no excuse for the delay, particularly since petitioner was allowed to advanced his petition by making telephone appearances, not in person, and he did not begin his prison sentence until November 2008, a few weeks after G.'s birth. Nor does the fact that the other adults involved might have resisted petitioner's efforts to meet the child and seek paternity of her provide any excuse for his delay.
I believe that petitioner should be estopped from claiming paternity (see Matter of David G. v Maribel G., 93 AD3d 526 [1st Dept 2012]). Petitioner failed to demonstrate that DNA testing was in the child's best interests and JAC has identified himself as G.'s father on her birth certificate and in acknowledging her paternity (id.). Under the majority's view, G. will have to [*13]endure a needless custody and visitation trial solely because petitioner has obtained default adjudications declaring him a father with standing to assert that right (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 23-24 [2016]). By his own account, G. and he are strangers, meeting for the first time in court. G.'s best interests in this case would be served by equitably estopping petitioner from claiming paternity, even if he is her biological father. As far as G. is concerned, JAC is her father and that father-daughter relationship has existed since birth.
The majority also concludes that this Court should not intercede in vacating the 2012 estoppel order and the order of filiation because the adults in G.'s life are at fault for the present condition of this case. The majority also concludes that granting relief in the interest of justice is misplaced in the context of a family law proceeding. The doctrine of equitable estoppel, however, is imposed by law "as a matter of fairness" (Shondel J. at 326). Most importantly, in this context, equitable estoppel focuses on the best interest of the child (id.; see K.G. v C.H., __ AD3d __, 2018 Slip Op 04683 [1st Dept 2018]; Shondel J. v Mark D., 7 NY3d 320, 327 [2006]). Furthermore, relief afforded "in the interest of justice" is not actually the application of a concrete, or defined doctrine, but a concept embodied by that phrase. The phrase describes or implies conditions calling for the court's exercise of discretion and the doing of things to being about "the type of justice which results when law is correctly applied and administered" (Hafkin v North Shore Univ. Hosp., 279 AD2d 86, 90 [2d Dept 2000], affd 97 NY2d 95 [2001][internal quotation marks omitted]). Thus, the discretionary nature of granting relief in the interest of justice means there is no hard and fast rule when it can or should be invoked. The only rule is that such discretion not be exercised "arbitrarily or willfully" and with due regard to "what is just and equitable under the law and all of the relevant facts and circumstances of a case" (see Hafkin at 90).
I agree with the majority that the adults responsible for G.'s well-being unduly complicated this case by adopting an ostrich-head-in-the-sand approach to the very difficult issues that arose. Under those circumstances, the AFC did her best to zealously represent G., although she was denied access to her. However, the shortcomings of G.'s mother and JAC should not be visited upon the child, obscuring the fact that it is G. who is directly aggrieved and affected by having her relationship and established bond with JAC disrupted. This is why I believe that in this case, the Court should exercise its discretion and grant the relief sought by the AFC in the interest of justice.
Finally, I find that there is insufficient evidence in this record to show that the paternity action was properly instituted against JAC. Although he may have had notice of the proceedings, and through his attorney sometimes participated in them, JAC should have been named as a necessary party, because his interests as G.'s father were directly affected (Thomas T., 121 AD3d at 801). I disagree with the majority that even though JAC was never a named party in the paternity proceeding, this is a mere formality. Nor do I agree that it would have just been a "better practice" to have done so, particularly since Judge Gribetz relieved JAC's attorney while the issue of paternity was still unresolved.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 19, 2018
CLERK



Footnotes

Footnote 1: There is no transcript of this appearance in the record, but upon review of a certified copy of the transcript, Judge Rosado determined in the December 15 Order that both petitioner and respondent appeared at that time and respondent made the concession indicated.

Footnote 2:It bears noting that when the order of protection was issued, petitioner and the child did not have a legally recognizable relationship that would have permitted the court to issue an order of protection in favor of the child (Family Court Act § 812).

Footnote 3: There is vigorous disagreement between the Family Court Judges regarding whether JAC was ever served as a necessary party in this action. Although, as will be seen, Judge Gribetz states JAC was served and accepted papers in court on September 21, 2011, there is no transcript of the court appearance available, nor is there an affidavit of service in the Family Court file. In his decision, Judge Gribetz acknowledged the absence of such an affidavit, but found that it was not necessary because JAC accepted service in court. There is no record of JAC ever making an appearance in court, although his attorney did make several appearances until relieved. The attorney was relieved after the court decided there was no estoppel issue, but before issue of petitioner's paternity was decided. JAC did not have legal representation when his acknowledgment of paternity action was vacated.

Footnote 4:While certainly the issue of whether to permit a party the opportunity to participate at a hearing by some means other than in person is within the trial court's discretion, it is worth noting that petitioner was allowed considerable latitude to make appearances without actually coming to court. This was on account of his being incarcerated and/or otherwise completing the terms of his sentence in Pennsylvania. The mother, however, was denied similar accommodations although she lived in Florida, had young children, she had an extant order of protection against petitioner and was of limited financial means.

Footnote 5:See footnote 1.